# Richmond

ARTHUR BROWN, JR. v. FRED R. AND ROBERT J. FOX, ET AL.

June 20, 1949.

Record No. 3533.

Present, All the Justices.

The opinion states the case.

*Douglas S. Mitchell* and *John E. DeHardit*, for the appellant.

*Harold H. Dervishian* and *J. H. Rives, Jr.*, for the appellees.

STAPLES, J., delivered the opinion of the court.

This is an appeal from an order of the Industrial Commission of Virginia dismissing a claim of the appellant, Arthur Brown, Jr., against Fred R. Fox and Robert J. Fox, a partnership known as Fox Brothers, his employers, and the American Mutual Liability Insurance Company, insurer, appellees. The Commission found that the partnership was engaged in the operation of a store, a farm, and a sawmill.

The appellant, on the 18th day of November, 1947, while unloading lumber from a truck, sustained a fracture of his left leg, from which he developed gangrene and an amputation was performed at the mid-thigh November 29, 1947. His claim against Fox Brothers for compensation was heard before the Industrial Commission on August 23, 1948. On January 4, 1949, a decision was rendered denying the claim on the ground that the appellant was an independent contractor and not an employee of Fox Brothers when the accident occurred.

The principal facts in the case are undisputed.

At the time of the injury, the appellant, a colored boy, was engaged in unloading from a truck a load of lumber which he had hauled at the request of Fox Brothers from their lumber mill at Milwood to the Quarles Lumber Yard at Ashland, Virginia.

The circumstances under which the appellant was directed by Fox Brothers to haul the lumber may be briefly stated as follows:

Fox Brothers owned a 1941 Ford truck, which, some months before, they had stored for sale on a lot in the city of Richmond. On November 12, about a week before the accident, the appellant and Fred Fox had a conversation with reference to the sale of the truck to the appellant. The negotiations were conducted entirely with Fred Fox. Appellant's statement of what transpired, which is uncontradicted, is as follows:

"I told him I did not have any money. He said he wanted $500.00 for the truck, but I told him I did not have any money but agreed to buy it. He told me to come over the next morning and to go to town to get it. Something happened so that I could not go the next morning, and he told me to come back the next morning. So I went back over, and he and I went over and got a battery, and, after he got the battery, he carried me to the place where the truck was. He left me with the battery to check the water. And he got the license and put the license on the truck. He took the truck to the service station and put some gas in it, and I brought the car up to the service station. He told me to take the truck down to Woods (T. W. Wood & Sons) and to wait until he got there. After he came we loaded the truck up with wheat and we got some more stuff at the store."

As to the method of paying for the truck, Fox gave the following testimony:

"Q. At the time the arrangement was entered into, Brown and his brother came and talked to you about it?

"A. Yes, sir; they came together.

"Q. Did they understand at that time whether or not he was to haul for you on the same basis as his brother did or otherwise?

"A. I do not know whether or not anything was said about that. It was more or less understood that he was

to haul and pay for it. And his brother was hauling for me at so much per cord for wood."

Appellant then drove the truck loaded with the wheat and some groceries to Fox Brothers' store, where the groceries were apparently unloaded, and Fox sent him along with a helper to unload the wheat at the Fox farm. This occurred on Thursday, November 13.

On the following Monday, November 17, the appellant reported at Fox's store and requested information as to what work he was to do. Fox directed him to drive the truck to a place in King William County and get a harrow and take it to the Fox farm. When he returned from this trip, he again saw Fox, who told him to go to the sawmill, load up the truck with lumber and take it to Quarles' lumber yard at Ashland, which he did. He was assisted in loading the lumber by a member of the Fox mill crew. He carried only one load of lumber on this day. The next morning, which was the day of the accident, he again went to the Fox store for directions as to what work he should do. Fox directed him to go to Manquin and get a drill and take it to the same farm. Fox further directed him, after he had gotten the drill, to go to the lumber mill and haul lumber to the Quarles Lumber Yard. He was accompanied both on the trip to King William County and that to Manquin by one of Fox's employees who assisted him. When he arrived at the mill, he was likewise assisted in loading the lumber on the truck by the mill crew employed by Fox. He hauled two loads of lumber to the same lumber yard at Ashland, and it was while he was hauling the second load that he sustained the injury here involved.

The appellant testified that he had no agreement with Fox as to how much lumber he was to haul, or any agreement as to the compensation he was to receive for hauling the wheat and groceries, the harrow, the drill, or the lumber. He also stated he had no agreement as to any particular place to which any lumber was to be hauled. He further testified that he had an agreement with Fox that he was to pay for the truck by working by the day, but it was not

understood at that time there was any particular type of work that he was to do.

Fox also testified that there was no understanding as to how much lumber the appellant was to haul, or how much per load, nor for how long he was to haul it; that he might haul one thousand, two thousand, or ten thousand feet. He corroborated the testimony of the appellant that he sent him for the harrow on Monday morning and for the drill on Tuesday.

The evidence shows that at this time Fox Brothers had working for them a boy by the name of Joe Taylor, whose compensation was $30 per week. His principal duty was hauling lumber for Fox Brothers on a truck owned by them, and at that time he was carrying it from the same mill to the same lumber yard at Ashland. Fox testified that he had the same supervision over appellant that he had over Joe Taylor; that if his work had not been satisfactory he felt at liberty to stop it. Fox further testified that, before he and appellant went to Richmond and got the truck, *he did not know that appellant would haul any lumber for him.*

The only evidence relied upon by the appellees as establishing a relationship of independent contractor is the following testimony of Fred Fox:

"Q. You yourself never made any agreement with him as to how much he was to get per thousand for hauling this lumber?

"A. I told him—these are the very words I used:—'If you want to haul lumber, Jimmy Hargrove is hauling it at $5.00 per thousand; if you want to haul, go ahead and haul.' "

Fox does not fix the time this statement was made, nor does he claim that there was any response to it by appellant, or any verbal acceptance of the offer. He does not claim that appellant voluntarily went to the lumber mill to haul lumber, nor does he deny that the only times appellant went there were when he was ordered by Fox to do so and to haul the lumber. There is no testimony to indicate whether Fox's offer was understood by appellant to apply

after the transfer to him of the title to the truck, or whether it might be applicable prior to that time. The testimony of appellant, as well as his actions, make it clear that he did not consider at that time that he was hauling lumber at $5.00 per thousand. Unless he did so understand there was no meeting of the minds and no agreement as to the contemplated compensation.

With reference to the purchase and sale of the truck, it is clear from the testimony of both appellant and Fox that no definite terms had been agreed upon. Fox testified that he wanted to transfer the title as soon as he could "so that he could pay for it;" that that would have to be worked out by reserving a lien or by a deed of trust. There never had been any agreement, however, as to the amount of the monthly payments or the exact method of securing the deferred purchase money. After the accident, Fox Brothers sold the truck to appellant's brother, but the record does not show that appellant consented thereto. Appellant never did get title to the truck.

The majority opinion of the Commission found the following facts:

"The truck was delivered to the alleged claimant on the day of the sale and remained in his possession continuously thereafter until a brother of the claimant took over the contract and presumably took possession of the truck at that time. The evidence further shows that the actual transfer of title papers covering the truck to the claimant had not been completed due to working out financial arrangements relating to the manner of payment. This phase of the transaction remained in tentative state with the mutual consent of both parties to the transaction. We must accept the fact that the transaction had not been consummated in full. However, the claimant was put in absolute possession of the truck where it remained until the contract was taken over by a brother. This fact, coupled with the statement of the defendant that he agreed to pay the claimant the sum of $5.00 per thousand for lumber hauled, is satisfactory evidence from which we may conclude the claimant was hauling lum-

ber by the thousand feet and using his own truck therefor. It disputes the idea of an employer-employee relationship. The fact the defendant informed the claimant at his request of the usual route followed by the trucks to the lumber yard is not, in our opinion, the exercise of supervisory control. This amounts to nothing more than imparting information upon the request of the party who wanted to use it.

"We find in this case none of the elements of employer-employee relationship. On the other hand, we do find an alleged claimant hauling lumber at a fixed price per thousand feet, in a truck which he had agreed to buy, and under his exclusive control. We are of the opinion the factual background does not justify, by proof or inference, the retention of the right of control and the means and methods of doing the work by the defendant. The defendant left the means and measures of accomplishing the work in the hands of the alleged claimant, free from advice on the part of the defendant.

"The finding is made the alleged claimant was an independent contractor, and for this reason there can be no recovery in the case. It is ordered that it be stricken from the docket."

Commissioner Martin did not concur in the view that the evidence was sufficient to establish that appellant was an independent contractor, and the following is an excerpt from his dissenting opinion:

"Fox testified that he told claimant that he could haul lumber for him at '$5.00 per thousand.' But the assignments he gave to claimant do not fit in with such an agreement. During the very few days that claimant worked for Fox he hauled six loads and three of them were lumber, the other three being hauling of an entirely different type and done at Fox's specific direction. All that Fox could say about compensation for this hauling was that he 'expected' to pay him. And Fox, like claimant, thought that he had complete control over claimant's work. When asked if he did not feel that he had 'the same supervision' over him as he had over Joe Taylor, an admitted employee, he replied, 'I had

the same supervision over him. If I want a harrow, I could send Hargrove or anybody after the harrow, which I do every day. It does not have to be my truck. I usually pay them.' There can be but little doubt but that Fox considered that he had the authority to require claimant to do anything he instructed him to do and to control the doing of it. Even assuming that Fox agreed to pay claimant five dollars a thousand for hauling, this was manifestly only a part of the understanding since claimant had to perform such other work that Fox assigned to him.

"I am of the opinion that a fair appraisal of the entire record renders it plain that the relationship of employer and employee existed. I would award compensation to claimant for the loss of his leg."

It is contended on behalf of the appellees that the finding of the majority of the Commission that appellant was an independent contractor is a finding of fact, and therefore is binding upon this court. It is, of course, well-settled that findings of fact, if supported by the evidence, are conclusive here on appeal. See *Johnson* v. *Capitol Hotel, Inc., post,* p. 585, 54 S. E. (2d) 106, decided this day. However, we cannot agree that, under the evidence here, the conclusion of the majority of the Commission, that a relationship of independent contractor existed rather than one of master and servant, is a finding of fact. On the contrary, it is clear that this is a question of law. As said by Mr. Justice Eggleston, in *Hann* v. *Times-Dispatch Pub. Co.,* 166 Va. 102, 105-106, 184 S. E. 183:

"Whether the existing status is that of an employee or that of an independent contractor is governed, not by any express provision of the workmen's compensation law, but by common law. *Crowder* v. *Haymaker,* 164 Va. 77, 79, 178 S. E. 803. No hard and fast rule can be laid down for ascertaining whether the status is one or the other. It must be determined from the facts of the particular case in the light of well settled principles.

"In 14 R. C. L., pp. 67, 68, section 3, it is said, 'The vital test in determining whether a person employed to do certain

work is an independent contractor or a mere servant is the control over the work which is reserved by the employer. Stated as a general proposition, if the contractor is under the control of the employer, he is a servant; if not under such control, he is an independent contractor. * * * In this connection the ultimate question is not whether the employer actually exercises control over the doing of the work, but whether he has the right to control.'

"In two recent cases we have said, 'The ordinary test is this: "Who has the power to control and direct the servants in the performance of their work?"' *Crowder* v. *Haymaker*, 164 Va. 77, 80, 178 S. E. 803, 804; *Epperson* v. *DeJarnette*, 164 Va. 482, 486, 180 S. E. 412."

It is well-settled that conclusions of the Commission upon questions of law, or mixed questions of law and fact, are not binding on us. In *Bagwell* v. *Doyle*, 187 Va. 844, 849, 48 S. E. (2d) 229, the legal question involved was whether the claimant before the Commission occupied the status of a person in destitute circumstances within the meaning of the statute there under consideration. In reviewing the order of the Commission holding that he was not in destitute circumstances, we said:

"Whether a person is capable of earning a livelihood depends upon the facts. The facts themselves are established in this case by uncontradicted evidence and are not in dispute. We think the conclusion to be drawn therefrom with respect to whether the appellant is in destitute circumstances is a question of law. We, therefore, are called upon to examine the evidence to ascertain whether there are any undisputed facts, in addition to those included in the 'findings' of the Commission, which are relevant to the question whether the appellant's physical condition is such as can reasonably be said to disable him from earning a livelihood."

See also, *American Furniture Co.* v. *Graves*, 141 Va. 1, 126 S. E. 213; *Clinchfield Coal Corp.* v. *Kiser*, 139 Va. 451, 124 S. E. 271.

We do not think the evidence in the case at bar sustains the Commissioners' finding that the arrangement be-

tween the appellant and Fox Brothers related solely to the hauling of lumber. In fact, we think it is clear from the evidence that there was no clear and specific contract entered into between these parties with reference to the employment of the appellant during the time the final consummation of the sale of the truck was being held in abeyance, pending preparation and execution of the title papers, the notes, and the lien securing them. The contract of employment was just as vague and indefinite as the contract of sale. Obviously, they both awaited clarification at the time when the sale was expected to be consummated. The evidence leaves no room for doubt that the appellant placed himself completely under the orders of Fox and did whatever Fox directed him to do and nothing else. Fox Brothers were under no contract obligation to allow him to haul lumber unless they desired to do so. They had Joe Taylor employed in hauling lumber on a Fox truck, and, unless the sawmill turned out more than he could haul, there might be no lumber available for hauling by appellant.

There was no clear and specific contract to haul any particular quantity of lumber to any particular place, and Fox's testimony shows that he could terminate any hauling of lumber at his pleasure.

We think it clear from the evidence that the sale of the truck by Fox Brothers to the colored boy, who had no money, was not made primarily to accomplish the sale of the truck, but rather to secure the boy's services at a time when, it is a matter of common knowledge, the labor supply was scarce. The evidence shows that there was need for appellant's services, not only in hauling lumber, but also in performing other work in connection with the store and the farm. Although Fox testified that when he agreed to sell the truck it was generally understood that the appellant was to pay for it by hauling, he further testified that *it was not contemplated at that time that he would pay by hauling any lumber*. It is reasonable to assume that he was assigned to the hauling of lumber because Hargrove, who had been engaged in that work, quit just before appellant reported

for work. At the time appellant was spending part of his time hauling lumber, Joe Taylor, Fox's employee, was the only other person engaged in such hauling.

Nor can we agree with the legal conclusion expressed in the Commission's opinion that appellant was in fact the owner of the truck. Appellant did not use it for any other purpose than hauling for Fox Brothers. It is true that it was turned over to him to do any hauling which they might desire done, but the terms of a contract of sale had never been agreed upon and there was no legal obstacle to prevent either Fox Brothers or appellant from failing or refusing to agree upon the final details of the terms necessary to consummate the sale.

But even if appellant had been the legal owner of the truck, and even if he had agreed that his compensation for hauling lumber would be $5.00 per thousand feet, these facts would not have justified the finding that he was an independent contractor, if Fox had authority to control and direct his actions, as he actually did do. There was no difference in the control exercised over appellant and over Fox's employee, Joe Taylor.

*Crowder* v. *Haymaker*, 164 Va. 77, 178 S. E. 803, involved the question whether a claimant for compensation under the Workmen's Compensation Act was an employee or an independent contractor. He and an associate had agreed to operate an abandoned coal mine owned by Crowder, the defendant. Crowder was to pay them for coal mined and delivered at the mine's mouth. They were to furnish their own explosives, caps, fuses, and certain other material. Crowder exercised no control or supervision whatever over the operation of the mine. In considering the question whether the fact that Crowder was to pay a definite price per ton for the coal mined fixed the status of the claimant as an independent contractor, Mr. Justice Holt, later Chief Justice, said:

"The manner of payment for services is an element to be considered and certainly servants may be paid for piece work. A ditch-digger who undertakes to dig a drain for

so much a yard does not cease to be a servant, nor does a miner who is paid so much for each carload of coal produced. *McKinstry* v. *Guy Coal Co.*, 116 Kan. 192, 225 P. 743, 38 A. L. R. 837. It is said that case is 'on all fours' with this in judgment. There the plaintiff furnished his own tools, powder, fuses, etc., but he was working in a mine which the defendant was 'operating.' *Undoubtedly if Crowder was operating this mine he is liable. But he was not.* * * *

*       *       *       *       *       *

"Sometimes it is said that the test is that *the contractor must do a definite piece of work.* That is to say, if he agrees to haul timber for a certain price, he must agree to haul all of the timber on a given tract of land. But manifestly this test cannot apply to a coal mine. * * *." (164 Va., at pages 80-81. Emphasis supplied).

In the case of *Hiebert* v. *Howell*, 59 Idaho 591, 85 P. (2d) 699, 120 A. L. R. 388, The Industrial Accident Board had awarded compensation for the death of David Hiebert. The decedent and his brother were employed under a contract to haul logs. They furnished their own trucks and hauling equipment, but in other respects were held to be under the general control of the employer. In rejecting the employer's contention that the decedent was an independent contractor, the court held that the fact that his employer could control and direct his actions was determinative of the question, and that the relation of employer and employee existed.

In *Fox Park Timber Co.* v. *Baker*, 53 Wyo. 467, 84 P. (2d) 736, 120 A. L. R. 1020, it was held that one engaged in hauling railroad ties was not an independent contractor but an employee under the Workmen's Compensation Act of Wyoming, although he furnished his own truck and was paid at a certain rate per tie, where it appeared that he was not obligated to haul a particular number of ties, and either he or the employee could terminate the employment at will.

See the annotation following the above case, 120 A. L. R. 1031, and also annotations in 42 A. L. R. 607 and 43 A. L. R.

1312. It appears from these annotations that the question of who furnishes the truck is subordinate to the question of who has the power of general control of the employee's actions.

It is to be borne in mind that the appellant was not a contract carrier and had not qualified as such under the Virginia statutes. Michie's Code, section 4097y(7), provides that no person shall operate or engage in the business of a contract carrier without a permit issued by the State Corporation Commission, although the permit requirement does not apply to persons engaged exclusively in certain agricultural transportation and the hauling of lumber.

Section 2154(82a)(g) provides that the Commissioner of Motor Vehicles "shall issue appropriately designated tags for property carrying vehicles to applicants holding themselves out for private employment as property carriers for rent or for hire, and to applicants who operate as contract-carriers * * *."

The tag which was obtained by Fred Fox at Richmond on the day the truck was turned over to the appellant was issued in the name of Robert J. Fox. Of course, the appellant could not secure an appropriate tag for the truck until he had a certificate of registration in his own name.

Upon consideration of the testimony as a whole, we conclude that there is no evidence which would justify an inference that the appellant was not subject to the control of Fox Brothers. It is clear that he was told when to haul lumber, where to haul it, and the route over which he should travel, and the fact that the mill crew assisted in the loading of the lumber indicates that this crew selected the lumber which was to be hauled. He was also directed when and where to do other hauling. For these and other reasons heretofore stated, it is our opinion that the relationship of master and servant existed between Fox Brothers and the appellant.

The testimony shows that Joe Taylor, who was operating a truck for Fox Brothers, received compensation of $30 per week, and the appellant testified that his average compensa-

tion during the preceding year, when he was engaged in assisting his brother in hauling pulp wood, was about $30 per week, and there is no evidence to the contrary. We think this sum, therefore, must be accepted as the average weekly wage upon which the appellant's compensation is to be based.

The order of the Industrial Commission is reversed and the case is remanded with direction to allow the appellant the proper amount of compensation, together with attorney's fees incurred in this litigation.

*Reversed and remanded.*